# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

| Present: The Honorable | **GARY ALLEN FEESS** | | |
|---|---|---|---|
| Renee Fisher | None | N/A | |
| Deputy Clerk | Court Reporter / Recorder | Tape No. | |
| Attorneys Present for Plaintiffs: | | Attorneys Present for Defendants: | |
| None | | None | |

**Proceedings:** (In Chambers)

**ORDER RE: DEFENDANT'S MOTION TO DISMISS FOR LACK OF JURISDICTION**

## I.
## INTRODUCTION

In 2008, the Principality of Monaco, which had retained Plaintiff Robert Eringer ("Eringer") to function primarily as a liaison with foreign intelligence services for a payment of 40,000 euros per quarter, allegedly breached that agreement by refusing to pay Eringer's fee. When Eringer sued in state court for breach of contract, defendant removed to federal court. Defendant now moves to dismiss the lawsuit pursuant to the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1604 et seq. Eringer opposes the motion on the ground that the "commercial activity" exception set forth in 28 U.S.C. § 1605(a)(2) applies in this case because the contract obligates him to perform non-governmental duties if requested by His Serene Highness Prince Albert II ("Prince Albert" or "the Prince").

As discussed in greater detail below, Eringer concedes that his principal duties under the agreement involved maintaining liaison with foreign intelligence agencies, which he also concedes constitutes a governmental function under FSIA jurisprudence. Thus, even assuming that Eringer has correctly characterized his secondary duties as "commercial activities," this is a proper case for dismissal under the FSIA. Moreover, the contract itself is indivisible, and Eringer has presented no authority for the proposition that a foreign sovereign can be forced to litigate in United States courts an alleged breach of an indivisible contract that involves both governmental and non-governmental elements. Finally, the Court notes that out-of-circuit authority suggests that the allegedly "commercial activities" encompassed by the contract in fact

JS - 6   LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

involve governmental functions and therefore fall outside the scope of the "commercial activity" exception. For these reasons, the motion to dismiss is **GRANTED**.

# II.
# PROCEDURAL BACKGROUND

Plaintiff Robert Eringer ("Eringer") filed this suit against the Principality of Monaco ("Monaco") for breach of contract and fraud for Monaco's alleged failure to pay certain agreed-upon compensation. (See generally Docket No. 12, First Am. Compl. ("FAC").) According to the First Amended Complaint ("FAC"), His Serene Highness Prince Albert II ("Prince Albert" or "the Prince"), the sovereign of Monaco, retained Eringer as an intelligence advisor in July 2002. (FAC ¶¶ 7–8.) According to the complaint, Eringer provided his services in the absence of any written agreement, and those services included: (1) vetting government officials prior to their appointment; (2) establishing relationships between Monaco and other foreign intelligence services; and (3) conducting corruption probes of Monaco officials. (Id. ¶¶ 7, 12–13, 21–22.) When Monaco allegedly failed to pay Eringer for services rendered in the first quarter of 2008, Eringer terminated his employment and filed this suit seeking 40,000 euros allegedly due for services rendered in that quarter . (Id. ¶¶ 16–17; Docket No. 1, Not. of Removal, Ex. A.)

Monaco removed the action to this Court, and Plaintiff filed an amended complaint. (Docket Nos. 1, 12.) On April 16, 2010, Monaco filed a motion to dismiss the suit for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). (Docket No. 17.) Monaco contends that, as a foreign sovereign, it is immune from the jurisdiction of U.S. courts and that the "commercial activities" exception to FSIA immunity does not apply. On June 10, 2010, the Court issued an order deferring its decisions so that the parties could complete jurisdictional discovery. (Docket No. 28, 6/10/10 Order.) Monaco appealed that Order, and the Ninth Circuit dismissed the appeal for lack of jurisdiction. (Docket Nos. 34, 48, 51.) The parties finally completed jurisdictional discovery and submitted supplemental briefs based on that discovery on July 29 and August 8, 2011. (Docket Nos. 76, 77, 78, 79.)

# III.
# FACTS

## A. ERINGER'S RETENTION

Plaintiff began performing "intelligence missions" for Prince Albert on an ad hoc basis in 1999. (Declaration of Robert Eringer ("Eringer Decl.") at 1.) In 2002, Prince Albert, the hereditary Prince at the time, put Eringer on retainer. (Id.) The Prince became sovereign Prince

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

in 2005 and kept Eringer on retainer until 2008, when Eringer terminated his employment because he had not been paid. (Id.)

Over the years, Eringer performed a wide variety of services for the Prince. Eringer primarily acted as an intelligence advisor, created liaison relationships with intelligence services of other countries, and investigated various individuals who were attempting to enter the Prince's "social orbit," to become associated with organizations that the Prince patronized, or to obtain government positions. (E.g., id. ¶¶ 1–3, 6–12, 25, 27, 32, 35, 36–39, 42, 44, 49, 54, 59, 74, 76, 77, 78–79, 86–87, 89, 91, 99, 103, 110–12, 114.) Eringer also performed other tasks, such as conducting negotiations with the mother of the Prince's illegitimate daughter, investigating who would leak information about the Prince to the press, and helping a woman who alleged she was raped by the Prince. (E.g., id. ¶¶ 22, 23, 28.)

**B. THE MODIFICATION OF THE AGREEMENT**

In August 2007, Prince Albert requested that Eringer reduce his retainer to 40,000 Euros per quarter starting the next quarter, beginning October 2007. (Id. ¶ 115.) Eringer agreed and suggested that, at that pay level, he should scale back his activities to "focus on maintaining the liaison relationships with foreign intelligence services." (Id.) Prince Albert agreed but also requested that Eringer be available to respond to "specific investigative directives." (Id.) Eringer agreed to that arrangement, and his duties consequently "changed to focusing on maintaining foreign liaison relationships and being on-call for Prince Albert's special needs that should arise." (Id.)

Eringer acknowledges that his verified amended complaint alleges that the Prince instructed him to "solely focus on maintaining and working the liaison relationships with foreign intelligence services" beginning in October 2007. (Declaration of Greg Craig ("Craig Decl."), Ex. 1 [Deposition of Robert Eringer ("Eringer Depo.")] at 23:10–24, 25:10–26:21; FAC ¶ 15 (emphasis added).) Eringer explains, however, that he also agreed to be available to investigate "whatever [the Prince] wanted me to investigate," but that he "thought that it would be very important that we keep liaison relationships open and that I would consider that my main activity." (Eringer Depo. at 19:13–23.) Eringer further explained that he was in "passive mode" and "receptive only to [the Prince's] specific requests to investigate something" and that in the absence of any such specific requests, "my contact with liaison relationships was the main event." (Id. at 36:10–15.) Eringer's understanding was that "the most important role that I should continue to play . . . were [sic] to keep alive the unofficial liaison relationships I had created with other intelligence services," and that the Prince agreed. (Id. at 20:16–22.)

JS - 6  LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

Eringer attests that between January and April 2008, the time period for which he allegedly was not paid, he researched, reviewed, and compiled dossiers on "persons of interest" Thamer al-Shanfari and Djamal Kaddaj, both of whom had recently moved to Monaco and were suspected to have "serious criminal backgrounds." (Eringer Decl. ¶ 117.) Eringer prepared to brief Prince Albert on these individuals "so he could avoid allowing them into his social orbit or [to] become associated with organizations of which Prince Albert is a patron." (Id.) In that time frame, Eringer also spoke to Mike Powers, a close friend and adviser to Prince Albert, on January 28, 2008. (Id. ¶ 121.) During that call, Powers informed Eringer that Gerart Brianti, an executive at Monaco's professional football club, was "telling everyone he is the real prince of Monaco" because he could influence the Prince's decision-making. (Id.) Powers also reported that Monaco's police chief and interior minister wanted the Monaco Intelligence Service to end and informed Eringer about Freemason associations in Monaco. (Id.) Eringer also spoke to Powers on February 18, 2008, when Powers informed Eringer that Prince Albert's godson and cousin had "not patched things up" with the Prince and that the cousin wanted Powers to arrange a social meeting. (Id. ¶ 123.) On a March 16, 2008, call, Powers informed Eringer that the Prince's recent wife had "become full of herself in [the] last year." (Id. ¶ 126.) Finally, during that time frame, Eringer "patch[ed] up the relationship and hurt feelings" with the chief of Liechtenstein's Financial Intelligence Unit after the Prince told the press "We're no Liechtenstein" in defending the Principality against tax exile charges. (Id. ¶¶ 124–25.) Eringer also maintained "[o]ccasional contact with . . . foreign intelligence services with whom I had liaison relations" during that time period. (Eringer Depo. at 42:5–9.)

**IV.
DISCUSSION**

**A. APPLICABLE LAW**

"The FSIA is the exclusive source of subject matter jurisdiction over all suits involving foreign states or their instrumentalities." Gupta v. Thai Airways Int'l, Ltd., 487 F.3d 759, 763 (9th Cir. 2007) (internal quotations and citation omitted). In Verlinden B.V. v. Cent. Bank of Nigeria, the Supreme Court explained the basis for, and impact of, the FSIA:

> In 1976, Congress passed the Foreign Sovereign Immunities Act in order to free the Government from the case-by-case diplomatic pressures, to clarify the governing standards, and to "assur[e] litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process," H.R. Rep. No. 94-1487, p.7 (1976), reprinted in [1976] U.S. Code Cong. & Ad. News 6604. To accomplish these objectives, the Act contains

JS - 6    LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

> a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.
>
> For the most part, the Act codifies, as a matter of federal law, the restrictive theory of sovereign immunity. A foreign state is normally immune from jurisdiction of federal and state courts, 28 U.S.C. § 1604, subject to a set of exceptions specified in §§ 1605 and 1607. Those exceptions include actions in which the foreign state has explicitly or impliedly waived its immunity, § 1605(a)(1), and actions based upon commercial activities of the foreign sovereign carried on in the United States or causing a direct effect in the United States, § 1605(a)(2). When one of these or the other specified exceptions applies, "the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 1606.

Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 488–89 (1983).

Where a defendant moves to dismiss under the FSIA and the plaintiff claims an exception to the act, the Ninth Circuit has adopted a burden-shifting framework to determine whether the FSIA exception applies:

> Where . . . the plaintiff alleges in his complaint that his claim is based on a foreign state's strictly commercial acts, the defendant must establish a prima facie case that it is a sovereign state and that the plaintiff's claim arises out of a public act. This proof establishes a presumption that the foreign state is protected by immunity. The plaintiff then has the burden of going forward with the evidence by offering proof that one of the FSIA exemptions applies. Once the plaintiff has presented this evidence, the defendant must prove its entitlement to immunity by a preponderance of the evidence.

Meadows v. Dominican Republic, 817 F.2d 517, 522–23 (9th Cir. 1987).

At issue in this case is the statutory exception for "commercial activit[ies]" under 28 U.S.C. § 1605(a)(2). "Under the 'commercial activities' exception, a foreign state is not immune if the plaintiff's cause of action is based upon a commercial activity carried on by the foreign state." Holden v. Canadian Consulate, 92 F.3d 918, 920 (9th Cir. 1996) (citing 28 U.S.C. § 1605(a)(2)). More specifically, a foreign state is not immune from jurisdiction where:

JS - 6   LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

[1] the action is based upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States[.]

28 U.S.C. § 1605(a)(2).

The FSIA defines "commercial activity" as "a regular course of commercial conduct or a particular transaction or act" and makes clear that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). "[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in trade and traffic or commerce." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992) (emphasis in original). "A foreign sovereign engages in commercial activity when it exercises 'only those powers that can also be exercised by private citizens,' versus those 'powers peculiar to sovereigns.'" Holden, 92 F.3d at 920 (quoting Saudi Arabia v. Nelson, 507 U.S. 349, 360 (1993)); see also Park v. Shin, 313 F.3d 1138, 1145 (9th Cir. 2002) ("[A]n activity is commercial unless it is one that only a sovereign state could perform."). "The commercial activity exception applies only where the sovereign acts 'in the market in the manner of a private player.'" Holden, 92 F.3d at 920 (quoting Weltover, 504 U.S. at 614). "For example, 'a contract to purchase military supplies, although clearly undertaken for public use, is commercial in nature and therefore subject to the commercial activity exception.'" Park, 313 F.3d at 1145 (quoting Joseph v. Office of Consulate Gen. of Nigeria, 830 F.2d 1018, 1023 (9th Cir. 1987)). The Supreme Court has held that "issuance of bonds in order to refinance government debt was commercial in nature because a private actor could issue bonds to refinance a debt." Weltover, 504 U.S. at 615.

Where a case involves the hiring of personnel, the Court must determine whether the duties for which the employee was retained are governmental or commercial in nature. Park v. Shin, 313 F.3d at 1145. The Court explores the factors that bear on that determination in the sections below.

**B. ANALYSIS**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

**1. EMPLOYMENT OF PERSONNEL UNDER THE FSIA "COMMERCIAL ACTIVITY" EXCEPTION**

Where the activity under review involves the employment of personnel, the Ninth Circuit has held that "employment of diplomatic, civil service or military personnel is governmental and the employment of other personnel is commercial." Holden, 92 F.3d at 921. Considered alone, this statement could be read as establishing that only employees who qualify as "diplomatic, civil service or military personnel" should be viewed as outside the "commercial activity" exception to the FSIA.[1] A closer reading suggests otherwise.

Although Holden contains a single sentence indicating that "the employment of other [non-civil service, diplomatic, or military] personnel is commercial," it does not expand on or explain that statement. See Holden, 92 F.3d at 921. Indeed, the court explicitly states only that "[b]ecause private parties cannot hire diplomatic, civil service or military personnel, such hiring is necessarily governmental." Id. It does not state that only persons within those categories constitute governmental personnel, or that all persons outside those categories are necessarily engaged in commercial activities. See El-Hadad, 496 F.3d at 664 (noting that a judge "might not be a civil servant (or diplomat or soldier) and still be engaged in quintessentially governmental work"). Rather, Holden's language was derived from a House Report on the FSIA indicating that "the employment of diplomatic, civil service, or military personnel" would be "governmental and not commercial in nature," while "employment or engagement of laborers, clerical staff or public relations or marketing agents would be *among those* included within the definition of commercial activity." Holden, 92 F.3d at 921 (quoting H. Rep. No. 94-1487, 94th Cong., 2d Sess. at 16, reprinted at 1976 U.S. Code Cong. & Ad. News 6604, 6615) (internal quotations and alterations omitted; emphasis added). In short, although the House Report identifies two groups of personnel—one that would qualify as governmental and one that would qualify as commercial – it does not indicate that <u>only</u> diplomatic, civil service, and military personnel qualify as governmental employees, just as it does not indicate that <u>only</u> laborers, clerical staff, or public relations and marketing agents qualify as commercial employees.[2]

---

[1] Eringer appears to urge the Court to adopt this reading of Holden. (See Plaintiff's Suppl. Br. at 34.) See also El-Hadad v. United Arab Emirates, 496 F.3d 658, 664 n.2 (D.C. Cir. 2007) (understanding Holden to "treat[] the civil servant question as effectively superseding the commercial/governmental distinction" and rejecting that supposed approach.) As discussed in the text, the Court concludes that Holden should not be read so narrowly.

[2] For example, neither Holden nor the House Report preclude categories of personnel whose duties, depending on their actual job descriptions, could be governmental or commercial in nature.

JS - 6　LINK: 17
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

Because the House Report does not claim to be providing an exhaustive listing of governmental and commercial employees, the Ninth Circuit's adoption of "the standard suggested by" that House Report, id., should be viewed as similarly limited. Indeed, the court in Holden did not need to address the status of such other kinds of employees, as the case concerned an employee who was "analogous to a marketing agent," and whose employment was therefore commercial. See id. at 922.

Later case law fully supports this reading of Holden. The Ninth Circuit in Park v. Shin did not refer to the Holden civil servant/diplomat/soldier standard in concluding that a deputy general consul's employment of a domestic servant was a commercial act. See Park v. Shin, 313 F.3d 1138, 1145 (9th Cir. 2002). Rather, the court there applied the traditional test of considering the nature of the activity and determining whether "only a sovereign state could perform" it or whether the role "could be played by a private actor." Id. Particularly in light of the reasoning in this later decision, the Court concludes that the applicable test in the Ninth Circuit for determining the nature of an employment contract remains whether the foreign sovereign "exercises 'only those powers that can also be exercised by private citizens,' [or] those 'powers peculiar to sovereigns.'" Holden, 92 F.3d at 920 (citing Nelson, 507 U.S. at 360). The Court will analyze the nature of Eringer's alleged employment contract under this framework.

### 2. THE NATURE OF ERINGER'S EMPLOYMENT

Here, Eringer has offered evidence that he was put on retainer to perform two basic functions during the first quarter of 2008: (1) to maintain liaison relationships with foreign intelligence services, and (2) to be available to respond to "specific investigative directives" from Prince Albert. (Eringer Decl. ¶ 115.) Eringer has admitted that maintaining relationships with foreign intelligence services was his primary role under the agreement and constituted his principal duties during the first quarter of 2008. (See, e.g., Eringer Depo. at 19:13–23, 20:16–22, 36:10–15.) The Court considers in turn the nature of Eringer's two duties.

#### a. Maintaining Relationships with Foreign Intelligence

Eringer's primary role of maintaining relationships with foreign intelligence services was governmental in nature. Sharing information with and maintaining relationships with

---

For example, a "research analyst" at Goldman Sachs would be engaged in a "commercial activity" while a "research analyst" working for the CIA would be involved in a quintessentially governmental function. What this example suggests is that focusing on labels as opposed to the actual duties performed by the employee tends to obscure rather than illuminate the analysis.

JS - 6     LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

intelligence officials in foreign countries is not "the type of action[] by which a private party engages in trade and traffic or commerce."  See Weltover, 504 U.S. at 614 (emphasis omitted). Rather, working with foreign intelligence officials is an act that "only a sovereign state could perform."  See Park, 313 F.3d at 1145.  Eringer argues in his opposition to the motion to dismiss that "[p]roviding private intelligence services is not a peculiarly governmental function."[3] (Plaintiff's Suppl. Br. at 34; Plaintiff's Suppl. Reply Br. at 8.)  That may be true but it is beside the point.  The question is not whether there is a commercial analog to this governmental function but rather whether commercial parties hire individuals to act as liaisons with the intelligence services of sovereign states.  Eringer cannot credibly argue that maintaining relationships with representatives of foreign intelligence agencies is an act that private parties perform.  Countries do not regularly share sensitive intelligence information with private parties, and there is no reason to think that Eringer could have maintained the liaison relationships had he not been associated with a sovereign nation.  Eringer conceded this point at the hearing on this motion.

Eringer also argues that the intelligence functions he performed were "unofficial" and that he was not "a member of Monaco's diplomatic, civil service, or military personnel," but rather was "a private independent contractor spy."  (Plaintiff's Suppl. Reply Br. at 8.)  This argument seems to rely on reading Holden to establish that only official civil servants, diplomats, and military personnel qualify as governmental employees.  Because the Court rejects that reading of Holden, Eringer's status as an independent contractor conducting "unofficial" governmental business is irrelevant.  Because maintaining liaison relationships with foreign intelligence services is a quintessentially governmental function, that aspect of Eringer's employment was governmental.

### b. Responding to "Specific Investigative Directives"

The Court also concludes that Eringer's secondary role of responding to the Prince's "specific investigative directives" was governmental, whether the Court focuses on the nature of Eringer's general retainer agreement or the particular additional duties that he actually performed during the relevant time period.  The record indicates that Eringer's general retainer agreement obligated him to be available to respond to the Prince's "specific investigative

---

[3] At the hearing on this motion, Eringer's counsel conceded that some of Eringer's functions "could be considered" governmental.

JS - 6  LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

directives." (Eringer Decl. ¶ 115.) In light of the duties that Eringer historically performed for the Prince (see Facts section above), this is best understood as requiring Eringer to be available to investigate individuals who were attempting to become associated with organizations the Prince patronized, to ingratiate themselves with the Prince, to obtain government positions, and those individuals who might be in some way seeking to undermine the prestige, power or influence of the Prince as the head of a sovereign state. Eringer has identified some of the activities that he actually performed during the relevant time period as follows: (1) he researched and reviewed dossiers on two suspected criminals so that he could advise the Prince not to become associated with them; and (2) he received information from Mike Powers, a close friend of the Prince who had information involving (a) an individual who was reporting he had significant influence over the Prince, (b) officials who wanted to shut down the Monaco Intelligence Service, (c) Freemason associations in Monaco, and other matters. (Eringer Decl. ¶¶ 117, 121, 123, 126.)

While some of these duties resemble those of a private investigator and hiring a private investigator is not something that only a sovereign has the power to do,[4] the precise services rendered by Eringer and the fact that he performed these services for a sovereign leader changes the analysis. Given the context, this case resembles Butters v. Vance International, Inc., in which the Fourth Circuit concluded that employment of a private security agent to protect the Saudi royal family was a governmental, not commercial, act. See Butters v. Vance Int'l, Inc., 225 F.3d 462, 464–65 (4th Cir. 2000). Plainly, hiring private security guards is not something that only a sovereign can do, and private parties can and do regularly hire private security. Nonetheless, the Fourth Circuit found it significant that the private security guard was hired to protect not just anyone, but the sovereign leader. See id. at 465. The court concluded that it was "difficult to imagine an act closer to the core of a nation's sovereignty" than "secur[ing] the safety of its leaders." Id. Here, the Court similarly concludes that providing investigative services in order to protect a sovereign leader from associations that could lead to manipulation, extortion, or allegations of corruption—and thereby to protect his ability to lead effectively—is likewise at the "core of a nation's sovereignty." In other words, although private investigative

---

[4] Monaco contends that Eringer's investigations into people and organizations with criminal or corrupt backgrounds serve the quintessentially governmental function of law enforcement. (Defendant's Suppl. Br. at 14–15; Defendant's Suppl. Reply Br. at 7.) The record, however, does not indicate that Eringer was performing these investigations in order to facilitate law enforcement. Rather, Eringer has attested that these investigations served to advise the Prince to avoid developing associations with these people. (Eringer Decl. ¶ 117.) The vetting of those who would associate with a sovereign leader to insure that is not compromised or possibly corrupted is a customary function of governmental employees.

JS - 6   LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

services are available commercially, similar services have a fundamentally different nature when they are used to protect a sovereign leader's power and prestige, just as private security services have a fundamentally different nature when they are used to protect a sovereign leader's safety. Because all of Eringer's services were governmental, employing him was not a commercial act exempt from FSIA immunity. The Court therefore must **GRANT** Monaco's motion to dismiss.

Further, even if the Court were to conclude that Eringer's secondary activities of responding to the Prince's specific investigative directives were commercial, it would nonetheless conclude that Monaco is immune from suit. The parties have not cited, and the Court has not found, any binding authority setting forth how to evaluate immunity under the FSIA when a claim is based on both governmental and commercial activities. In Saudi Arabia v. Nelson, the Supreme Court expressly declined to "address the case where a claim consists of both commercial and sovereign elements." Nelson, 507 U.S. at 358 n.4. The D.C. Circuit, however, has held that "when a transaction partakes of both commercial and sovereign elements, jurisdiction under the FSIA will turn on which element the cause of action is based on." Millen Indus., Inc. v. Coordination Council for N. Am. Affairs, 855 F.2d 879, 885 (D.C. Cir. 1988). The court will lack jurisdiction over claims based on sovereign elements but retain jurisdiction over claims based on commercial elements of the transaction. See id. The Eleventh Circuit has similarly held that courts should determine whether commercial and sovereign elements of a contract are "separable" and then assess whether the plaintiff's claim was based on the commercial or sovereign element. See Honduras Aircraft Registry, Ltd. v. Gov't of Honduras, 129 F.3d 543, 548 (11th Cir. 1997). Even if this analytical framework is consistent with the statutory purpose of the FSIA, it is of little help here because Eringer's claim is based on an indivisible contract – he receives a single retainer payment every quarter for performing the services described under the agreement without any percentage allocation of that payment to the respective duties to be performed. The Court sees no way to dictate a method of allocation and is aware of no authority that would permit it to do so. Thus, while Eringer alleges that Monaco promised to pay him a lump sum to perform both of those duties, the Court sees no way to disentangle the two services that Eringer performed to allow him to enforce his right to payment for the (commercial) private investigator services, while recognizing Monaco's right to immunity from the claim for payment for the (governmental) intelligence services. Indeed, when asked at the hearing, neither party was able to offer any suggestions for how to disentangle the two portions of the contract.

The parties have not cited, and the Court has not found, any authority guiding what the Court should do in such a "hybrid" situation where a contract and claim are based on inseparable governmental and commercial elements. Should the hybrid nature of the activity inure to the benefit of the sovereign or the plaintiff? Does the presence of some governmental activities give

JS - 6   LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

rise to complete immunity, or does the presence of some commercial activity defeat immunity altogether? In other words, should Monaco receive immunity from suit over commercial acts that otherwise would not give rise to immunity, or should Monaco lose immunity to which it would otherwise be entitled? In light of the FSIA's purposes, the Court concludes that, at a minimum, when the governmental elements of a hybrid activity predominate, the foreign sovereign is entitled to immunity notwithstanding the presence of some inseparable commercial elements. The FSIA framework of recognizing immunity for sovereign actions and not for commercial actions "is designed to accommodate the legal interests of citizens doing business with foreign governments on the one hand, with the interests of foreign states in avoiding the embarrassment of defending the propriety of political acts before a foreign court." Broadbent v. Org. of Am. States, 628 F.2d 27, 33 (D.C. Cir. 1980). This congressional purpose would be undercut if the commercial tail were permitted to wag the sovereign dog. Where the sovereign elements of a hybrid action predominate, the foreign state's interest "in avoiding the embarrassment of defending the propriety of" those acts must trump. Judicial interference with sovereign activities could "have serious foreign policy ramifications for the United States." Butters, 225 F.3d at 465. This reality counsels in favor of avoiding abrogating a foreign state's immunity from claims based on sovereign activities simply because they are inseparable from the commercial elements of the claim. Thus, the Court holds that where an activity contains both commercial and governmental elements that cannot be disentangled, a foreign sovereign is immune from claims based on that activity where the sovereign elements of the activity predominate.

Here, the sovereign elements of Eringer's contract plainly predominate. Eringer's counsel conceded as much at the hearing. Eringer described his role maintaining liaison relationships with foreign intelligence services as his "main activity," the "main event," and "the most important role that [he] should continue to play." (Eringer Depo. at 19:23, 36:15, 20:17–18.) Indeed, when he filed his amended verified complaint, he described his contract as requiring him "solely" to focus on those duties. (FAC ¶ 15.) These activities are unquestionably sovereign in nature. Thus, even if Eringer's secondary activities qualify as commercial, the sovereign elements of his contract predominate, and Monaco is therefore nonetheless entitled to immunity from Eringer's claims under the FSIA. Monaco's motion to dismiss must be **GRANTED** for this independent reason.

## IV.
## CONCLUSION

For the reasons set forth above, the Court concludes that Eringer's contract is entirely governmental in nature and therefore that the commercial activities exception to the FSIA does

JS - 6  LINK: 17

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

| Case No. | CV 10-1803 GAF (Ex) | Date | August 23, 2011 |
|---|---|---|---|
| Title | Robert Eringer v. Principality of Monaco et al | | |

not apply here.  In the alternative, even if Eringer's secondary "special investigative" duties under the contract qualify as commercial activities, Monaco is nonetheless entitled to immunity because the governmental elements of Eringer's claims predominate and cannot be disentangled from the commercial elements.  Thus, regardless of how Eringer's secondary special investigative duties are characterized, the commercial activities exception to the FSIA does not apply and Monaco is entitled to immunity.  The complaint is therefore **DISMISSED with prejudice** for lack of jurisdiction.

**IT IS SO ORDERED.**